```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   IP CO., LLC              )(

 5                            )(    CIVIL DOCKET NO.

 6                            )(    2:09-CV-037-DF

 7   VS.                      )(    MARSHALL, TEXAS

 8                            )(

 9   ONCOR ELECTRIC DELIVERY  )(    APRIL 19, 2010

10   COMPANY, LLC, ET AL      )(    1:00 P.M.

11                      MOTIONS HEARING

12         BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM

13               UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFFS:  (See attached sign-in sheet.)

18

19   FOR THE DEFENDANTS:  (See attached sign-in sheet.)

20

21
     COURT REPORTER:      MS. SHELLY HOLMES, CSR
22                        Deputy Official Court Reporter
                          2593 Myrtle Road
23                        Diana, Texas  75640
                          (903) 663-5082
24

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

```
 1                        I N D E X

 2   April 19, 2010

 3                                          Page

 4       Appearances                        1

 5       Hearing                            3

 6       Court Reporter's Certificate       51

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LAW CLERK:  All rise.

 2              THE COURT:  Please be seated.

 3              We've got some discovery motions set in IP &

 4   Company, LLC, against Oncor Electric Delivery Company

 5   and others, 2:09-CV-37.

 6              What says the plaintiff?

 7              MR. WARD:  Johnny Ward and Ryan Walsh for

 8   the plaintiff, Your Honor.

 9              THE COURT:  Y'all are ready to proceed?

10              MR. WALSH:  Yes -- yes, Your Honor.

11              MR. GARDNER:  Good afternoon, Your Honor,

12   Allen Gardner here with Lisa Kobialka, and we're ready

13   to proceed, sir.

14              THE COURT:  All right.

15              MR. GARDNER:  Also, I wanted the Court to be

16   aware that Sensus is a defendant in this case, and they

17   don't have a -- they don't have a dispute here so

18   they're not here, but they just wanted us to let the

19   Court know that's why they're not here.

20              THE COURT:  Okay.  All right.  Well, I'll

21   try not to get them involved in a dispute that they're

22   not involved in, okay?

23              MR. GARDNER:  Yes, sir.

24              THE COURT:  I think you've got the first

25   motion, so let's hear it.  How much time do you need?
```

1           MR. WALSH:  Maybe 15 minutes, Your Honor.

2           THE COURT:  I'll give each side 20 minutes

3    to argue.  Can you consolidate the arguments, you think,

4    on both motions --

5           MR. WALSH:  Yes, Your Honor.

6           THE COURT:  -- in that time period?  Okay.

7           MR. WALSH:  Yes, Your Honor.  Again, my name

8    is Ryan Walsh, and I'm here with the firm of Robbins,

9    Geller, Rudman & Dowd on behalf of the plaintiff, IP Co,

10   LLC, which is a D -- has a DBA of Intus IQ, and they're

11   the plaintiff in this case, and we're here on their

12   motion to compel defendant's, Trilliant Networks,

13   documents and information from defendant Trilliant.

14          First, I just want to thank you, Your Honor,

15   for allowing us to be heard this morning -- or this

16   afternoon, rather.  The motion -- Intus' motion really

17   places two concise issues before the Court.

18          The first is can Trilliant limit discovery

19   to only products that are specifically identified by

20   product brand name in the infringement contentions that

21   Intus IQ has served in this case?

22          And the second is whether Trilliant has

23   satisfied its obligations under Local Rule --

24          THE COURT:  Has the source code been

25   produced?

1               MR. WALSH:  It has.

2               THE COURT:  Have y'all looked -- have y'all

3    looked at that?

4               MR. WALSH:  We have not looked at the source

5    code yet, Your Honor.

6               THE COURT:  Okay.  When was it produced?

7               MR. WALSH:  They -- we were informed in --

8    in -- I think, on December 16th that they were willing

9    to make that available after -- that was four months

10   after they were supposed to have made it available, but

11   they told us in December that they would make it

12   available.  And in late December, they said at a date

13   and time to be determined, they would make it

14   available.

15              THE COURT:  Okay.  And what has happened

16   since that time?

17              MR. WALSH:  Since then, we -- we have not

18   reviewed the source code because we don't think that

19   they've made all of it available.  They've only -- to

20   our understanding, they're only willing to make it

21   available for the three products that we specifically

22   identified by product name.

23              And rather than go and review it twice and

24   expend -- because, in essence, we have our expert fly

25   out to inspect the code, and so rather than do that

1    twice, we wanted to wait and get this issue resolved and

2    then review the source code one time.

3              THE COURT:  All right.

4              MR. WALSH:  And, Your Honor, that sort of

5    brings me to my first point.  In reviewing the reply

6    brief that -- that was filed by Trilliant in this case,

7    they represented for the first time that they had

8    produced documents and information regarding all the

9    products that had been identified by IP Co in the case

10   and all reasonably-related mesh networking products.

11             And we were surprised to see that, Your

12   Honor, because, frankly, that's what we thought we

13   were -- we were fighting about.  They had consistently

14   represented prior to that point, again, that they were

15   only going to produce documents and information

16   regarding the products that had been specifically

17   identified by product brand name.

18             And so I -- it -- it begs the question,

19   though, I suppose, as to exactly what they mean by

20   identified by IP Co because -- and -- and, again, in the

21   infringement contentions, IP Co has identified a number

22   of products as accused products, three of them by brand

23   name.  And we believe all should be subject to

24   discovery.

25             And in their -- in their discovery

1    responses, interrogatory responses, they have not -- the

2    only three products that they have responded -- we asked

3    them to identify all the products --

4            THE COURT:  That was my next question is

5    have you got a list of the products that manu -- that

6    are manufactured by Trilliant that operate on the mesh

7    network that they have identified?

8            MR. WALSH:  They -- they have only -- they

9    have only confirmed the three products that we've

10   identified by name, and so we have an interrogatory

11   that's pending, and they still have only listed those

12   three products, Your Honor.

13           So in short, what we're seeking here with

14   this motion is an order compelling the production of

15   responsive documents and information regarding

16   Trilliant's SecureMesh Network, including all the

17   devices and components that operate on that network, as

18   well as any wireless networks that are reasonably

19   similar.

20           And then, secondly, an order compelling the

21   full 3-4(a) production regarding the SecureMesh Network

22   and any reasonably similar networks.

23           And -- and really everything is tied to the

24   initial issue, Your Honor, which is the proper scope of

25   discovery in this case.

1           Now, I do -- I'm willing to provide -- I'm

2    certainly willing to provide some background if it

3    would be helpful to Your Honor regarding this case and

4    the technology that is at issue.  If -- if you don't

5    feel that would be helpful, I'm happy to jump right into

6    it.

7           THE COURT:  I mean, I've read your papers --

8           MR. WALSH:  Okay.

9           THE COURT:  -- and I've read your

10   contentions --

11          MR. WALSH:  Okay.

12          THE COURT:  -- or at least a good portion of

13   them, so I think I've --

14          MR. WALSH:  Well, I -- I think the one --

15   just by way of background, the -- just to be clear,

16   the -- the Trilliant SecureMesh Network is the network

17   that was accused.  The infringement contentions, they

18   specifically identify as accused instrumentalities the

19   SecureMesh Network and devices operating thereon,

20   including without limitation the SecureMesh Gateways,

21   SecureMesh Devices, including without limitation utility

22   meters, programmable communicating thermostats, and so

23   on.

24          It -- it specifically lists a number of

25   products, including some products by -- by product brand

```
 1    name.  When the -- when Trilliant initially served its

 2    responses to our discovery, they made it clear that they

 3    would not produce any source code and that they would

 4    not produce any information regarding any products that

 5    we had not identified by product brand name.

 6              The latter they have maintained up and until

 7    the filing of the motion.  The second they did agree to

 8    produce at least some source code immediately before the

 9    motion.

10              Just with respect to --

11              THE COURT:  What source code have they

12    agreed to produce?

13              MR. WALSH:  They have not clarified that,

14    Your Honor, but we -- we presume that it's -- it's

15    regarding the three products that we've listed by

16    product brand name.

17              The -- just with respect to the Rule 3-4(a)

18    motion -- the order regarding compelling documents

19    regarding Rule 3-4(a), again, if -- if -- if they will

20    agree to produce 3-4(a) documents regarding all the

21    products we've identified and all reasonably similar

22    products, then I don't think we have an issue there.

23    But, again, it -- I think it goes back to the original

24    question as to exactly what products we've identified.

25              And, again, they've maintained that we've
```

1    only identified three products by brand name, and so

2    those are the only products that are properly subject to

3    discovery.  And -- and that's really the primary issue

4    that's before the Court on our motion.

5              We believe we're entitled to discovery on

6    all the accused instrumentalities that we've listed, as

7    well as any reasonably similar products.

8              The argument that we have to specifically

9    identify products by brand name fails both on a factual

10    level and a legal level.

11              On a factual level, we have identified the

12    network by brand name as the SecureMesh Network.

13              THE COURT:  Let me --

14              MR. WALSH:  Yes.

15              THE COURT:  -- interrupt you.  By products

16    that are reasonably similar, I under -- I mean, that's

17    easy to say, but it's a little bit more difficult for me

18    to get my hands around.  Are you talking about products

19    that they might manufacture that use the same link

20    quality indicator that you've identified in your

21    contentions?

22              MR. WALSH:  Your Honor, I think we're --

23    we're talking about two different levels, really.  I

24    mean, there -- there's the SecureMesh Network, and then

25    we've identified certain devices that operate on that

1   network.

2              THE COURT:  Right.

3              MR. WALSH:  So we believe we're entitled

4   to -- to discovery on those devices that we've

5   identified, as well as any reasonably similar devices

6   that might also operate on the SecureMesh Network.

7              THE COURT:  Okay.

8              MR. WALSH:  We also believe that to the

9   extent that they offer other wireless mesh networks like

10  the SecureMesh Network, that we're entitled to discovery

11  on those networks, as well.

12             THE COURT:  Okay.  Okay.

13             MR. WALSH:  And -- and so, again, as a

14  factual matter, we've identified the accused system by

15  name, we've identified products by name, at least to

16  some -- certain extent some -- some on a generic level,

17  but we've used the exact same terminology that they've

18  used in their marketing materials.

19             So to -- to the extent that they argue they

20  don't know what we're talk -- talking about, we believe

21  that's difficult to believe.

22             On a legal level, quite frankly, there's --

23  there's simply no support in the case law to limit

24  discovery to devices that are specifically identified by

25  brand -- product brand name.  We asked them for it.  We

1   couldn't find it ourselves.  They haven't provided it to

2   us.  We don't believe it exists.

3            And, in fact, to even go a step further, as

4   Your Honor is aware, Courts in this district have

5   allowed discovery on products that aren't even listed in

6   the -- in the infringement contentions, as long as

7   they're reasonably similar and the plaintiff has

8   provided a specific theory of infringement and the

9   products operate in a manner reasonably similar to

10  that theory.  And I think that's the issue that we were

11  just -- were just getting to.

12           As a practical matter, we have identified

13  a -- we've identified -- we've provided two specific

14  concise theories of infringement.  One is the local area

15  network, or I think Trilliant generally refers to it as

16  a neighborhood area network level which is where you --

17  you have a mesh network in a gateway.  The mesh network

18  is the meters and so on.

19           The other is the home area network where you

20  have a micro access portal in devices in the home.

21           THE COURT:  ZigBee-type?

22           MR. WALSH:  Exactly.  Yes, Your Honor.

23           So the -- the -- Trilliant has, in essence,

24  offered a few arguments as to -- to why they should not

25  have to produce documents regarding these products we

1    haven't identified by product brand name.  Their --

2    their first few arguments, though, are -- are, in

3    essence, more generic than that.  I mean, first they

4    argue that our -- our motion was premature.  And -- and

5    to be clear, that's not the case.  We spent -- I think

6    we sent our first deficiency letter in early October,

7    and we waited until mid-January before we filed our

8    motion.

9          In that time -- and, frankly, in their last

10   correspondence at the end of December, they made it very

11   clear that they were not going to produce any -- any

12   information or documents regarding any products that we

13   hadn't mentioned by brand name, the three products.

14         They made it clear in that December 28th

15   letter that they had actually completed their Rule

16   3-4(a) production in September, even though they had

17   produced no source code at that time and they hadn't

18   produced a single document that was labeled even

19   confidential under the protective order.

20         We asked them for many -- many times at that

21   point what had been withheld and what had been produced,

22   and they -- they wouldn't tell us.

23         In the motion, they also asked us why we

24   hadn't reviewed the source code, and -- and at the time,

25   when they -- when they did that, they -- they pointed

1  out that -- that according to them, the source code was

2  the most important -- the most important source of

3  information regarding the operation of the accused

4  products.  But for the four months immediately preceding

5  that, they had refused to produce it and claimed it was

6  irrelevant.

7          And, again, at this time, we haven't

8  reviewed it because we're waiting for the outcome of

9  this order so we can do it all at once.

10          But the second argument they made is that

11  it's defective.  We don't believe it's defective.  We

12  pointed out that the -- actual discovery requests

13  interrogatories that are at issue.

14          And, finally, they claim that we're seeking

15  discovery on every product in the country -- I mean,

16  company.  That's, again, simply not true.  We simply

17  seek discovery on the SecureMesh Network and the

18  products that operate thereon.

19          The -- the argument that they've set up,

20  they've also mentioned the CellReader product, Your

21  Honor.  As you saw in the papers, again, the -- the

22  CellReader product, I think, fits under the reasonably

23  similar area, and we -- frankly, we -- we don't know if

24  it's reasonably similar or not.  We haven't -- we don't

25  have enough information at this point to determine that

```
 1   one way or another.  But we did offer a compromise to
 2   try to resolve that, and -- and they did not take us up
 3   on our compromise.
 4              Finally, Your Honor, they -- they have
 5   argued that their deficiencies are somehow excused
 6   because our infringement contentions are deficient, and
 7   that really gets at the heart of their motion.
 8              They basically make two arguments, Your
 9   Honor.  One is that we failed to identify a theory of
10   infringement.  And, second, that our infringement
11   contentions failed to identify the products that are --
12   that are at issue with any reasonable popularity -- or
13   I'm sorry, particularity.  Neither of those arguments
14   really holds water, Your Honor.
15              With respect to the -- to failing to
16   identify concise theories of infringement, Trilliant
17   waited over six months to file this motion, and they
18   only did so in response on our motion to compel.  During
19   that time, according to them, they made a -- a
20   sufficient and full Rule 3-4(a) production.  They
21   provided responses to interrogatories, produced
22   documents.
23              So they -- they can't -- as the -- as the
24   Court has put it, they can't lay behind the log and then
25   claim that they -- they didn't have sufficient notice.
```

1    I think more importantly with respect to this case, the

2    parties -- they did initially raise complaints about our

3    infringement conten -- contentions I think back in

4    August of this year.  And at that time, the parties went

5    through a -- a long, frankly exhaustive meet and confer

6    process with a number of letters, e-mails, and a

7    telephonic meet and confer, set up an in-person meet and

8    confer.

9              At the end of that process, they cancelled

10   the in-person meet and confer and sent us a letter.  And

11   in the letter, what they specifically said was as -- as

12   we discussed in great detail during the telephonic meet

13   and confer, IP Co's preliminary infringement contentions

14   pursuant to Local Rule 3.1 identify four Trilliant

15   products by name as accused products in this case.

16   Therefore, Trilliant will only produce discovery

17   responses and documents for these specific products.  If

18   IP Co disagrees and can identify by name any other

19   product that is alleged to have infringe, we'll consider

20   expanding our discovery responses and discovery

21   production.

22             At no point in that letter did they say that

23   they didn't have sufficient notice or they didn't

24   understand our -- our theories of infringement.  And,

25   again, they can't lay behind the log for six months and

1   then claim that they didn't have notice.

2          More importantly, again, we have identified

3   the two concise theories of infringement, both on the

4   local area network and the home area network level.

5          And then, finally, it -- it's difficult for

6   us to understand how they can refuse to produce

7   documents for months, including source code, which is

8   obviously not publicly available, and then complain that

9   our -- that our infringement contentions lack sufficient

10  or -- or lack detail.

11         The second argument is that our infringement

12  contentions only specifically identify the -- the three

13  products by brand name.  And I know their letter listed

14  four products, but they were actually -- there was a

15  micro access portal that was listed twice, and I believe

16  that's just a -- a single product.

17         Again, Your Honor, that -- that -- that

18  argument simply doesn't hold water.  The '271 patent, as

19  you've seen, is a system patent.  It -- it refers to the

20  system as a whole, and we've accused the SecureMesh

21  Network.

22         The '516 patent refers to a gateway between

23  two networks.  And, again, we're talking about the

24  SecureMesh Network.  Both patents cover technology for

25  routing information within the wireless network.

1              Again, these -- these infringement

2    contentions specifically ID -- identify where the claim

3    elements can be found in the accused systems using the

4    same terminology that they have in their -- in their

5    publicly-available marketing materials.

6              The -- again, Your Honor, this is well

7    briefed as far as the actual -- the elements of the

8    system, and so I -- I -- unless you believe it will be

9    helpful, I won't go into detail on that.

10             But -- but, again, we -- we've specifically

11   identified the devices that operate on the network with

12   the information that was publicly available to us.

13             And then I think, finally, Your Honor,

14   it's -- it's important to recognize the nature of this

15   product.  This isn't a product that you can go pick up

16   at Home Depot or Lowe's.  This is a system.  It's a --

17   it's a complex system that -- that you can't just go

18   buy.  It's usually customized to a client's needs or to

19   a customer's needs.

20             They've told us that the SecureMesh

21   Communications can be imbedded in a wide variety of

22   products, and so it's impossible for us to define every

23   manifestation of the infringement, and we've cited the

24   Orion case as an example or -- or as support for that --

25   for the theory that as long as we provide a

1  manifestation of infringement that provides notice of

2  our theory, that that is sufficient in a situation like

3  this.

4          And -- and then, finally, Your Honor,

5  their -- their motion also -- also mentioned

6  interrogatory -- I think their Interrogatory No. 1, at

7  least individual Interrogatory No. 1, and they claim

8  that our response to that interrogatory was

9  insufficient.

10          In short, that -- that interrogatory asked

11  for nothing less than for us to state the -- the full

12  legal and factual basis for our claim of infringement

13  against Trilliant.  It -- it has sub -- seven subparts

14  that ask for everything from claim construction of 12 --

15  112(6) claims to all facts, theories, and materials you

16  intend to rely on at trial.

17          At this time, we've -- we've referred them

18  to our infringement contentions.  We believe that the

19  infringement contentions provide the information that

20  they're requesting.  And to the extent that it doesn't,

21  we believe -- or we understand once we have an

22  opportunity to review all of the technical information

23  in their source code, we will likely be in a position

24  to -- to supplement our infringement contentions, if

25  necessary, at that time.  And that that may answer

1    whatever questions they have.

2              So, again, in -- in conclusion, Your Honor,

3    we believe that it's -- it's -- it's clear they can't

4    limit discovery in this case to products that have been

5    identified by brand name.  With their local 3-4(a)

6    production, if they've produced everything, then they

7    should just come -- come out and say so and identify

8    the products that they've produced information

9    regarding.

10             And, third, the infringement contentions

11   that we've produced are -- are sufficient under the law.

12             If there's nothing further.

13             THE COURT:  All right.  Thank you.

14             MR. WALSH:  Thank you, Your Honor.

15             THE COURT:  You've got about three minutes

16   left.

17             MR. WALSH:  Okay.

18             MS. KOBIALKA:  May it please the Court.

19   Lisa Kobialka on behalf of Trilliant Networks.

20             Your Honor, I want to start with a very

21   simple principle up front.  We have not taken the hard

22   line that they've described with respect to document

23   production.  In fact, what we've produced -- and this

24   dates all the way back to when we did our invalidity

25   contentions -- we produced information regarding the

1   meters, the in-home displays, the remote appliance

2   controller, collectors, repeaters, thermostats, the

3   network itself, so we've not limited it to those

4   specific named products.

5            And there -- what they've done is taken a

6   dispute way out of context.  Well before they even filed

7   their motion, we kept articulating, we understand your

8   contentions only so much.  We understand these products

9   that you've identified, and we understand you're

10  referring to a mesh network.

11           Understand Trilliant also has cellular

12  technology, which is separate.  It's not reasonably

13  similar.  It's a totally different technology.  If you

14  believe that that's somehow at issue and that should be

15  part of the scope of discovery, then let's talk about it

16  now because Trilliant is a very small company with very

17  limited resources, and to go out and collect all of the

18  information relating to everything is incredibly

19  burdensome and incredibly expensive for a company.

20           THE COURT:  Okay.  Let me stop you there.

21  Have you told them -- well --

22           MS. KOBIALKA:  I can --

23           THE COURT:  Well, hold on a second.  Have

24  you identified the products for them that operate on the

25  SecureMesh Network that Trilliant makes?

```
 1              MS. KOBIALKA:  Yes.

 2              THE COURT:  Okay.  And you've provided a

 3    list of those to them?

 4              MS. KOBIALKA:  They have our product lists.

 5    They -- they have our technical specifications.  Yes --

 6              THE COURT:  But those have been --

 7              MS. KOBIALKA:  -- they have all of it.

 8              THE COURT:  -- but those have been

 9    identified as the products that operate on the -- your

10    client makes that operate on the SecureMesh Network?

11              MS. KOBIALKA:  Yes.

12              THE COURT:  Okay.  What other networks or

13    network, other than SecureMesh, does Trilliant make?

14              MS. KOBIALKA:  There's no other mesh network

15    that Trilliant makes.

16              THE COURT:  Okay.  What other networks do

17    they make?

18              MS. KOBIALKA:  They have a cellular-based

19    technology.  I wouldn't necessarily characterize it as a

20    network, but reasonable minds can differ on this.  It

21    utilizes cellular technology which is basically just

22    talking back and forth from a phone to another unit

23    and -- and back.  That's it.  It can provide information

24    over cell lines.

25              THE COURT:  Okay.  And does that -- do
```

1    products that operate on -- in your cellular-based

2    network, do they also operate on the SecureMesh Network?

3               MS. KOBIALKA:  To the extent they have,

4    they've been produced, but --

5               THE COURT:  But -- but --

6               MS. KOBIALKA:  The -- the answer is, I don't

7    believe they actually work, but there has been some

8    marketing materials that indicate that CellReader may

9    have been offered for sale as a potential -- not that

10   they actually had it, but there is the potential to add

11   on the CellReader product.

12              THE COURT:  And is that the product that

13   y'all were taking the position that y'all ought to

14   only -- if you had to produce anything, produce sales

15   data instead of technical data for that product?

16              MS. KOBIALKA:  No.  We were talking about

17   the cellular technology.  We -- we produced the

18   information about CellReader to the extent it had to do

19   with the mesh network.

20              THE COURT:  Okay.

21              MS. KOBIALKA:  And -- and to be clear, we --

22   we told them that's what we were doing in the December

23   28th letter, so this is well before they filed their

24   motion.  We said, we'll produce documents relating to

25   the products they've identified, as well as any

1    reasonably related documents, i.e., any documents that

2    refer or relate to the four named accused

3    instrumentalities.

4            And -- and I can give you a listing of

5    everything that we have produced in this case in terms

6    of technical documentation, among other things.

7            THE COURT:  Okay.  That's -- go ahead.  I've

8    cut you off.  I've just got questions that I --

9            MS. KOBIALKA:  That's fair.

10           We -- we provided an engineering

11    specification which sets forth how the Trilliant mesh

12    layer works, so it goes directly to how the network

13    works in and of itself.  That's been provided.  All

14    product descriptions, product lists, data sheets,

15    technical specifications, electrical certification tests

16    were provided, engineering documents for how the network

17    communicates.  We provided product manuals.  We provided

18    RFPs, so any RFPs that they had submitted that is not

19    under a confidentiality agreement, we were able to

20    produce.  We produced all of our pilot program

21    documentation.

22           Trilliant, as it stands, has not actually

23    been able to sell this product.  There's no utility out

24    there that has said, okay, we're going to go for a full

25    implementation.  They have a handful of pilot programs

```
 1    with different utilities throughout the United States.

 2              And so those agreements have all been

 3    produced and all the company documentation and source

 4    code for all of those products have been produced.

 5    We -- we said, you can have that source code.

 6              Our dispute about source code has been

 7    mischaracterized, and I'd like to elaborate on that

 8    specifically.  The source code that we said we would not

 9    provide has to do with aggregation software, whereby

10    Trilliant for the utilities collects the electricity

11    usage and aggregates that information for the utility's

12    purposes.

13              That particular software program really has

14    nothing to do with how the network in and of itself

15    works.  We said, we'll provide you with the information

16    about how that -- what that program is about, and we

17    did.  We produced all of the documentation that we have

18    about that program, but to go and provide that source

19    code was unnecessary, frankly wasn't helpful, and it's

20    really not relevant to the issues in dispute, but we

21    said, look, if you want to tell us how that particular

22    source code is relevant, let us know.

23              As far as source code goes under the

24    protective order, they are supposed to come to counsel's

25    offices and review them, and we've told them it -- it's
```

1    available.  You can -- you can review it.

2              This -- this whole issue seems to stem

3    around -- they keep saying you haven't produced

4    anything.  We keep asking, what is it that you think

5    we're not producing?

6              THE COURT:  Well, it's -- the reason I asked

7    my last question about the CellReader documents is

8    because in Footnote 4 to your response, you said that

9    although IP Co's claims to seek discovery on CellReader

10   under the convoyed sales damages theory, IP Co fails to

11   explain why it seeks technical documents only relevant

12   to an infringement claim, rather than the sales

13   documents that would be relevant to convoyed sales

14   theory.

15             So have you produced the technical documents

16   or have -- have you not?

17             MS. KOBIALKA:  We've produced all of the

18   technical documents as related to the mesh network, yes.

19             THE COURT:  Okay.  But you are not going

20   to --

21             MS. KOBIALKA:  We have not -- not --

22             THE COURT:  -- produce them on the

23   CellReader?

24             MS. KOBIALKA:  That's correct.

25             THE COURT:  Okay.  Are you stipulating that

1    the CellReader products operate as a -- functionally

2    with the SecureMesh Network --

3                MS. KOBIALKA:  I --

4                THE COURT:  -- as is required for them to

5    show their convoyed sales --

6                MS. KOBIALKA:  No.

7                THE COURT:  -- argument?

8                MS. KOBIALKA:  I -- I don't believe that

9    it's actually ever been sold as part of the -- the pilot

10   programs that they have or part of the -- the offerings.

11   I think it was sort of pie-in-the-sky hopes, and that

12   was what Trilliant had sold previously, that they were

13   going to be able to, you know, build off of their

14   CellReader and -- and their cellular networks that they

15   had sold previously when they entered into this sort of

16   new area which now has gotten to be known as Smart Grid

17   technology.

18               THE COURT:  Okay.  Okay.  All right.  Well,

19   that may be one reason they need technical documents is

20   what I'm telling you is to assess the -- how

21   functionally related or unrelated it is to the

22   SecureMesh Network.

23               MS. KOBIALKA:  And -- and we've told them,

24   look, this is -- we've given them information.  We've

25   shown them publicly available information, as well.

1    They have it in the production.  We provided -- we did

2    not -- put it this way, we did not go out and exclude

3    CellReader.  If it was discussed within the mesh

4    network, we went ahead and produced it.

5              And -- and the whole purpose for -- for

6    doing this up front was to ensure that when we went out

7    and did our word search for all documents, and this

8    included getting documents from multiple locations, that

9    we were being as broad as possible.  So we tried to

10   capture absolutely everything that was covered for the

11   word "mesh," everything that was covered for the word

12   "route," anything that had to do with the Servicom

13   software so they can get a description and understanding

14   of what that information is, as well as the specific

15   products they identified and the products that we

16   thought were reasonably related to the -- the mesh

17   network itself.

18             So we went out, we -- we collected all of

19   that.  We had hoped that we could really resolve this

20   dispute before we got into any of it, and that was

21   really where the -- this -- how we got into the

22   invalidity contention -- or the infringement contentions

23   issues was through a description of products.

24             But we have not limited our production in

25   the way that they have described, and we really have not

1   taken this hard line that they keep saying.  In fact, we

2   were broader than providing what would be reasonably

3   similar.  We went to anything that was reasonably

4   related or referred to the mesh network, and we keep

5   asking them if there's something you think that's

6   missing, please let us know, but don't turn around and

7   just say, you haven't produced everything, without

8   telling what -- what it is.

9           We're -- we're reasonable.  If you tell us

10   if it's reasonably related to this, we're going to go

11   ahead and provide it.

12           THE COURT:  Tell me again what source code

13   you've offered to make available.

14           MS. KOBIALKA:  So all of the -- the source

15   code for the products that I had identified to the

16   extent there's any source code for the actual mesh

17   network itself, they can have that, what's on the

18   gateways, what's on -- to the extent there's any in

19   the -- the meters that work on the mesh network or any

20   of the in-home displays that would work on the mesh

21   network.

22           THE COURT:  But you've -- you've offered

23   source code, then, for all of the products that your

24   client makes that operate on the SecureMesh Network?

25           MS. KOBIALKA:  Yes, yes.

```
 1              THE COURT:  Okay.  Okay.  Go ahead.

 2              MS. KOBIALKA:  The -- the -- what we're --

 3   we're dealt with now is -- and I believe really what the

 4   dispute is is whether or not the cellular technology is

 5   at issue, and this was something that, frankly, I raised

 6   from -- from day one.

 7              After we received their preliminary

 8   infringement contentions, we wrote to them within a week

 9   and a half and said, we need to sit down and talk.  We

10   don't think they're sufficient.  What you've described

11   here is really broad.  It's vague, and we want to

12   understand it better.

13              No less than five times before we served our

14   invalidity contentions, recognizing that the scope of

15   what's accused could affect what invalidity is involved,

16   particularly if they're accusing cellular technology as

17   being part of the accused products, but we met and

18   conferred with them no less than five times, including a

19   pretty lengthy call-in, which I had a discussion with

20   lead trial counsel for IP Co explaining to them these

21   very issues, which is that there is cellular technology

22   and then there's this mesh technology.

23              And they said, anything that runs on a

24   network is what's at issue.  We said, that's too broad.

25   That cannot be what's at issue here, and we've
```

1    subsequently tried to resolve it.

2          At one point, when a different party was

3    scheduled to do a meet and confer regarding the

4    infringement contentions, we had looked into whether or

5    not we could attend that particular meeting.  We were

6    unable to attend that meeting, so this big deal about we

7    supposedly canceled the meeting is not accurate.

8          We continued to meet and confer with them in

9    good faith, and I'm sure you've seen just the -- the

10   tons of correspondence with regard to the meet and

11   confer efforts that were done before we had the

12   in-person meet and confer in December.  And we kept

13   telling them, this is what we're going to produce,

14   despite the fact we really don't understand what's at

15   issue.

16         We also served this interrogatory to try and

17   help us understand what your theories are because we

18   still don't believe you've explained to us how these

19   particular products infringe.

20         At this point, they've had our

21   documentation -- all of our technical documentation.

22   They've had access to our source code, and they should

23   be able to respond to it, whether it's in the

24   infringement contentions or whether it's specifically in

25   the interrogatories.

```
1              But we -- we don't want to have Trilliant
2    have to bear the burden of going through, collecting all
3    of its information with regard to its cellular
4    technology which dates back a fair number of years
5    without some specificity about what it is that they're
6    looking for.
7              And we tried to do a pull.  We found it's
8    about 1.5 -- close to 1.5 of terabytes of information
9    that would be out there.  And just to upload it alone
10   for processing, even before attorney review, would be
11   about a hundred thousand dollars.  And I actually got a
12   declaration from a vendor, if the Court is, you know,
13   interested in seeing it all, but that's a lot of money
14   to Trilliant, particularly when it really doesn't have
15   any significant sales of any note here in the -- in the
16   U.S.
17             And so it -- it was just something that we
18   could not agree to just go ahead and provide.  And
19   there's really no explanation why that technology would
20   have anything to do with the network system of the '271
21   patent or the gateway between the '516 patent, which it
22   had absolutely nothing to do with the gateway itself.
23             So, Your Honor, at this point, we're --
24   we're asking for them to at least provide us, whether
25   it's in the infringement contentions or in the
```

1    interrogatory which we have propounded on them, to give

2    us the specifics on what their infringement theories are

3    to make sure that we've covered the universe of prior

4    art, as well as the issues that -- that are potentially

5    involved in this case.

6            There's only one RFP that I believe is still

7    in dispute, and that is RFP No. 18 where they asked for

8    CVs or resumes of anyone who ever contributed in any way

9    to the SecureMesh or the -- the mesh technology that

10   Trilliant has.  And that is such a broad particular

11   request.  I'm not really sure why that would be

12   appropriate.  We've identified the specific individuals

13   in our interrogatories who are most knowledgeable about

14   the aspects of our mesh network technology, including

15   source code, so on the programming side, as well as the

16   networking side.

17           And so I believe that's the only RFP that is

18   really at issue here because that could be possibly -- I

19   mean, there's so many people that have potentially

20   contributed in some way or some form to the mesh

21   network, and so that's so open-ended and was

22   problematic, but with respect to all the other --

23           THE COURT:  Well, how -- how many people is

24   it?

25           MS. KOBIALKA:  Well, in the -- the history

1    of the company for -- for mesh networking in any of

2    those products?

3                THE COURT:  I mean, their CVs, right?  I

4    mean --

5                MS. KOBIALKA:  Yeah -- well, I mean, we'd

6    have to go back and take a look.  There's been a huge

7    turnover at the company, and it could be 50 to a hundred

8    people over time to the extent we  --

9                THE COURT:  A hundred pages of CV?  I mean,

10   see, this is my point.  I mean, that's really not an

11   unreasonable request, I mean, to me.  It's -- you know,

12   tell us about the folks who were involved in -- in

13   manufacturing this.

14               MS. KOBIALKA:  Well, that -- I don't know

15   that that was their request.  I thought it was

16   contributed in any way whatsoever to the -- the mesh

17   network.

18               THE COURT:  Well, but, you know, as opposed

19   to y'all's position, it's we're going to give you the

20   people who we think are most knowledgeable about it.

21   They're entitled, I think, to know the people who

22   contributed to -- to the mesh network.  And I -- you

23   know, I think if you sat them down and asked them in a

24   deposition, they'd be required to respond to that

25   question.  I mean, discovery is pretty broad.

1          MS. KOBIALKA:  It -- but if it's limited to

2     just the technical aspects of it, that's one thing.

3          THE COURT:  Well --

4          MS. KOBIALKA:  I mean, there's -- there's a

5     lot of people that conceivably at this company and over

6     time would have contributed to the mesh network.  And --

7     and so it's not as easy as you might think, given that

8     there's been almost a complete turnover at the company

9     just within the last year or so.

10          So we've done the best that we can to

11     identify all the people that would have relevant

12     information.  We did that in our initial disclosures up

13     front.  And if we had to provide those CVs, we could do

14     so, to the extent that they have all of that.

15          Other than, that's the only thing that's --

16     that's even at issue at this point.  But we've told them

17     that we're producing all documents in response to their

18     discovery requests.  They keep asking us what we're

19     withholding.  We keep telling them we're not withholding

20     anything.  We are producing documents in response to

21     your requests.

22          THE COURT:  Okay.  But your representation

23     to me, though, on -- back on the primary issue is that

24     other than the SecureMesh Network -- well, other than

25     this cellular-based technology, you've produced or

1   offered to produce all of the source code related to the

2   SecureMesh Network and any products that operate

3   thereon; is that right?

4              MS. KOBIALKA:  Right.  Right.  And I'm being

5   more -- the mesh network, right?  SecureMesh is sort

6   of -- it's a marketing name, but whatever mesh

7   technology --

8              THE COURT:  Right.

9              MS. KOBIALKA:  -- that they have, yes,

10  we've -- we've offered that.

11             THE COURT:  Okay.  And so the dispute

12  essentially boils down to whether or not I think that

13  this CellReader technology is technology that's

14  reasonably similar to the SecureMesh or the mesh network

15  technology?

16             MS. KOBIALKA:  Well, I think it boils down

17  to whether or not --

18             THE COURT:  Because you -- you had -- you

19  acknowledge they're entitled to discovery of the mesh

20  network and any other reasonably similar network?

21             MS. KOBIALKA:  Right.  And to the extent

22  that the CellReader has been somehow implemented within

23  the mesh network, those documents have been produced.

24             THE COURT:  Okay.

25             MS. KOBIALKA:  So if it was just CellReader

1    on its own, previously, we didn't -- we didn't provide

2    that.  We didn't go out and specifically look for old

3    CellReader documentation, but to the extent it has

4    anything to do with the mesh network, we produced it.

5                   THE COURT:  All right.

6                   MS. KOBIALKA:  Do you have any further

7    questions, Your Honor?

8                   THE COURT:  No.

9                   MS. KOBIALKA:  Thank -- thank you for your

10   time.

11                  MR. WALSH:  Just very briefly, Your Honor.

12   From our standpoint, that -- that -- and I believe this

13   is reflected in the correspondence between the parties

14   that lead up -- led up to the motion, but much of what

15   you've just heard, this is the first time we've heard

16   it.

17                  But -- and you don't have to take my word

18   for it.  Interrogatory No. 3, we basically asked them

19   for a list of the products that they're willing to

20   produce information about.  They gave us three products.

21   They've never -- to my knowledge, they've never

22   supplemented it.  They said that we'll produce

23   information regarding the three products that are

24   specifically named.  They haven't listed another

25   product.  They haven't supplemented it, to our

1  knowledge, and -- and, again, Your Honor, that's part

2  of the problem.  We -- we keep asking them, what are you

3  producing, what are you withholding, and they won't tell

4  us.

5          Just look at that December 28th letter.

6  The -- the author of the letter specifically wrote, I

7  haven't personally reviewed all the documents, so I

8  can't tell you what's being produced and what's not

9  being produced.  So may -- maybe it's confusion.  Maybe

10 we're just talking past each other, but -- but that's

11 why we've tried to ask them, what are you producing and

12 what aren't you producing?

13         But from what I understood from counsel's

14 representations, we have, I think, enough for a consent

15 order on just about everything, other than certain

16 CellReader aspects, which, again, we think we're

17 entitled to see that information.  But -- but -- and --

18 and we think that's appropriate, but certainly

19 everything else -- my understanding is they're willing

20 to produce information and documents regarding all the

21 products that we've listed in there as it relates to the

22 SecureMesh Network.  And if that's the case, then I

23 think we -- we're prepared to enter into a consent order

24 in that regard.

25         Finally, Your Honor --

1           THE COURT:  Well, on the CellReader, I think

2    it's architecture, how is cellular just in general

3    covered by these claims?

4           MR. WALSH:  The -- Your Honor, it's not --

5    what -- what the -- the '270 -- well, I should say the

6    '516 patent relates to a gateway device --

7           THE COURT:  Right.

8           MR. WALSH:  -- that's between two networks.

9    One --

10          THE COURT:  Home network and then the

11   larger --

12          MR. WALSH:  Well, one is a wireless mesh

13   network.

14          THE COURT:  Wire, right.

15          MR. WALSH:  It could be the meters.  And

16   with respect to the mesh network where it's the meters

17   on one side, on the other side is a wide area network,

18   and -- and that's basically the back hall back to the

19   utility.

20          Now, my understanding -- and, again, we --

21   we haven't seen much in the way of CellReader, so I -- I

22   don't have a firm grasp as to exactly how it operates,

23   but my understanding is the CellReader can be used to

24   transfer some of that information that's collected to

25   the mesh network to get back to the utility or -- or

1    otherwise.  So -- and -- and this is represented in

2    their marketing materials that the CellReader product

3    is -- can be used in connection with the SecureMesh

4    Network.

5              And so, again, I think we're entitled to at

6    least -- to Mrs. Kobialka's point, we don't want any

7    more information than we need.  We certainly don't want

8    terabytes of information we don't know need, but that's

9    why we've asked them, what -- what are you going to

10   produce and what are you going to withhold and -- and --

11   to try to work that out, but thus far -- and, again, I

12   think the correspondence reflects this.  They've been

13   very steadfast in exactly what they'll produce and what

14   they won't.

15             So -- and -- and -- and I think that's all I

16   have, Your Honor, unless you have any questions.

17             THE COURT:  Well, would the representations

18   about source code, are you in a position to go and look

19   at the source code?

20             MR. WALSH:  Your Honor, if -- I mean, again,

21   it's -- it's hard to make that determination in the

22   dark because I -- I -- I don't know exactly what source

23   code -- to my knowledge, and I could be wrong, and --

24   and Ms. Kobialka and I weren't -- she was not involved

25   in a number of the discussions that I had with -- with

1   counsel for Trilliant on these issues.

2              I don't recall any explanation as to exactly

3   what source code they were going to make available.  We

4   understood it was only going to relate to the three

5   products that we had identified.  If -- if there

6   are certain --

7              THE COURT:  I just understood it was going

8   to relate to any product that was manufactured by her

9   client that operates on this mesh network and the

10  network itself.

11             MR. WALSH:  And -- and I think that's --

12  that's -- that would be sufficient, I believe.

13             Now, if there's other source code -- it's --

14  it's hard to tell, Your Honor, for instance, with --

15  with the -- these patents.  The patents don't just cover

16  elements in the network.  It also covers the routing of

17  information within the network.  A lot of times that's

18  covered by source code.

19             THE COURT:  Well, that's what -- I mean,

20  your contentions, for example, don't spell out the

21  instructions for analyzing a data packet to determine if

22  the data packet has been sent to a new optimal route and

23  things like that.  If you had the source code, then you

24  could supplement your infringement contentions which, I

25  think, is her argument on her cross motion.

 1            MR. WALSH:  And -- and I -- and I believe

 2    that's correct, Your Honor.  That -- I think that

 3    information regarding exactly how the routing operates

 4    is going to be in the source code, but my -- my point,

 5    though, Your Honor, is -- or it very well could be.

 6    That source code, we don't know without looking at the

 7    source code whether it's -- it's the source code in the

 8    gateway or whether it's in the client or whether it's

 9    back in the back hall of the utility somewhere that

10    actually influences those routing -- those routing

11    protocols.

12            So it's difficult for us to say in a vacuum

13    whether it's -- it's just the source code for the mesh

14    network or whether there may be other elements of -- of

15    the source code back at the utility that may influence

16    the routing -- routing protocols.

17            So, again, we -- we believe we're entitled

18    to any of the source code as it relates to the -- the

19    routing of information within the networks.

20            THE COURT:  Okay.  All right.

21            MR. WALSH:  Thank you, Your Honor.

22            MS. KOBIALKA:  Your Honor, may I address --

23            THE COURT:  Well, you've got a cross motion,

24    so very briefly.  I ordinarily don't allow sur-rebuttal,

25    so you're -- you're getting away with something simply

 1    because you have a cross motion.

 2                 MS. KOBIALKA:  I -- I will be very, very

 3    brief.

 4                 As far as he pointed out, Interrogatory No.

 5    1, that we identified three prod -- products, those

 6    responses to interrogatories were occurring at the time

 7    that we were having our meet and confer discussions

 8    about what the accused products actually were.  And

 9    subsequently, we've informed them that we've produced

10    everything that's reasonably related.

11                 And, once again, it's -- it's in the

12    correspondence.  I mean, I read for you a quote that we

13    put in our December 28th letter, trying to be as clear

14    about what we were producing and what not, so, you know,

15    what -- what they're suggesting with respect to how

16    we've addressed discovery is just -- just not

17    appropriate.

18                 As far as our document production, they --

19    they have the technical information source code, as well

20    as very specific engineering specifications that provide

21    all of the information and details that would fill in

22    whatever blanks that they may have with respect to

23    routing protocols.  And they've had it for months and

24    months and months.

25                 In fact, I believe that was part of our

1    original production that occurred back in September, so

2    there is no reason why they cannot provide us with some

3    specificity about the limitations in the claims, whether

4    it's in the infringement contentions or in the

5    interrogatory.  We just want to get an understanding of

6    which aspects they're accusing of infringement because

7    once again, that affects a lot of different issues, as

8    well as the invalidity issues that are ongoing in this

9    particular case.

10            And as far as our document production goes,

11   we've provided them with a product list.  I mean, they

12   have our best information about all the products that we

13   sell.  And if there's something that we missed for some

14   reason when we did our word searching, just tell us.

15   We're more than happy to go ahead and provide that, and

16   I'm happy make that -- continue to make that

17   representation, as I have throughout in the case.

18            But we would really like them to identify

19   what the infringement bases are with more specificity

20   and specifically now that they have all of our product

21   information, with regard to which specific products, and

22   they can, you know, point to our own documentation for

23   that.

24            THE COURT:  Okay.  Well, the -- I mean, my

25   order is going to require you to make available all of

1    the source code for products that your client

2    manufactures that operate on the mesh network, as well

3    as the mesh -- any component that operates on the mesh

4    network to which you've got access to the source code.

5            And with respect to -- I'm going to order

6    the production of the CVs of people who've contributed

7    to the development of the network.

8            I'm also -- I'm going -- I'll carry the

9    cellular item, and I'll get you an order on that.  But,

10   you know, insofar as there's any other technical

11   documents that you're holding back for some reason with

12   respect -- I mean, the scope of production is going to

13   be the same with respect to technical documents as it is

14   for source code.  It's going to be technical documents

15   related to any product that operates on the mesh

16   network, and -- and it's going to extend to networks

17   that are reasonably similar to the mesh networks.

18           Now, I don't know whether it's called

19   SecureMesh or -- or something else, but if it's -- if

20   it's reasonably similar to that, that's going to be

21   the -- the -- included in the order.  So I'll -- you

22   know, I don't know -- I don't know how -- how much more

23   specific I can make it than that at this point, but I'll

24   make the decision on the cellu -- the CellReader item,

25   and if that's in, it's in.  If it's not in, then it's

1    not in.

2              MS. KOBIALKA:  And, Your Honor, to be clear,

3    we have given whatever is reasonably similar.  There --

4    there's only the mesh network and then the cellular

5    technology and so we --

6              THE COURT:  Well, then -- then you'll have

7    no problem complying with my order.

8              MS. KOBIALKA:  We think we -- we have

9    already.

10             THE COURT:  Okay.

11             MS. KOBIALKA:  So, I mean, I want to be

12   clear.  We really do think we -- we've already done all

13   of this already.  So whether it's miscommunication or

14   otherwise, that's fine, Your Honor.

15             THE COURT:  Well --

16             MR. WALSH:  Could I -- just one point of

17   clarification.  Again, their interrogatory responses

18   only refer to three products.  So I just --

19             THE COURT:  Well --

20             MR. WALSH:  -- and we've asked --

21             THE COURT:  -- I'm -- I'm assuming, based on

22   what she's told me, that's their only three products.  I

23   mean, and if it turns out that's not correct, then I

24   mean --

25             MR. WALSH:  Well, we know that's not

1   correct.

2              THE COURT:  Well, then, I've been told

3   something that's incorrect.  I mean, I -- I don't mean

4   to --

5              MR. WALSH:  And that's -- Your Honor, I --

6   just to be clear, and I'm not -- I'm not saying anybody

7   said anything that's not accurate.  My point is simply

8   the -- the interrogatory --

9              THE COURT:  I mean, I'm not limiting the

10  scope of discovery to products that are specifically

11  identified by brand name.

12             MR. WALSH:  Okay.  And our -- our motion

13  requested the compelling -- the production of documents

14  and interrogatory responses --

15             THE COURT:  Well --

16             MR. WALSH:  -- consistent with the -- the

17  proper scope of discovery, and -- and so -- and, again,

18  currently their Interrogatory No. 3 where we've asked

19  them to identify all these products so we know exactly

20  what we're talking about only refers to three products.

21  And it also generally refers to 33(d) without

22  identifying the documents, so --

23             THE COURT:  I'll -- I'll add something about

24  interrogatories.

25             MR. WALSH:  Thank you.

 1              THE COURT:  But I'm more concerned with the

 2    documents and the source code issue than the

 3    interrogatory, but I'll -- you know, if -- if she wants

 4    to compile a list and attach it -- or if she has a list

 5    and she can identify it with specificity under Rule

 6    33(d), I'll allow her to do that, as opposed to

 7    regurgitating the list into an interrogatory response.

 8              MR. WALSH:  Sure.

 9              THE COURT:  Okay.  But it needs to be, you

10    know, plain from anyone reading the interrogatory,

11    exactly what list you're referring to, okay?

12              MS. KOBIALKA:  Right.  And I -- I just

13    wanted to be clear.  All I represented was we were still

14    in the meet and confer process about what was at issue

15    at the time those things were responded to, but

16    subsequently have explained what our position is in the

17    33(d) response that was intended to identify a product

18    list, which we'll go ahead and do.

19              THE COURT:  All right.

20              MS. KOBIALKA:  That's not a problem.

21              THE COURT:  All right.  I'll set you a

22    status conference for June the 30th at 10:30.  We'll see

23    where we are.

24              When can you get out there to see the source

25    code?  Can you do it within 30 days?

```
 1              MR. WALSH:  I'd set -- 45 days.  We've got
 2     to get -- we've got to coordinate with our expert who's
 3     in New York, and I -- I presume the source code will be
 4     in the California, at their offices in California, so --
 5              THE COURT:  All right.  You need to -- you
 6     to need to make it all available within 45 days.  You
 7     need to go look at it, and then you need to supplement
 8     your -- your contentions before the hearing on the 30th,
 9     and we'll see where we are --
10              MR. WALSH:  Okay.
11              THE COURT:  -- at that time, and if there's
12     any more discovery problems, I'll take care of them on
13     the 30th, okay?
14              MS. KOBIALKA:  Your Honor, if I may, I am in
15     trial on that date, but hopefully I can find someone who
16     can do it.  I just want you to be aware --
17              THE COURT:  I'm sure you're not going to
18     have any problems.
19              MS. KOBIALKA:  Correct.
20              THE COURT:  Okay?
21              MS. KOBIALKA:  I agree.
22              THE COURT:  Then you can send Mr. Gardner
23     over here with Mr. Ward and y'all can announce that
24     y'all have resolved your discovery problems, but I --
25     you know, that's -- I'm going to -- if you're in trial
```

1   and there's a problem, you need to send somebody, okay,

2   that's familiar with the case and what all you've told

3   me today, okay?

4              MS. KOBIALKA:  Absolutely.  Thank you, Your

5   Honor.

6              THE COURT:  All right.  Thank you.

7              LAW CLERK:  All rise.

8              MR. WALSH:  Thank you, Your Honor.

9              (Hearing concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a

 4     true and correct transcript from the stenographic notes

 5     of the proceedings in the above-entitled matter to the

 6     best of my ability.

 7

 8

 9
       SHELLY HOLMES                        Date
10     Deputy Official Reporter
       State of Texas No.: 7804
11     Expiration Date:    12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```